2018 PA Super 82

| | |
|---|---|
| DANIEL BERG, INDIVIDUALLY AND AS THE EXECUTOR OF THE ESTATE OF SHARON BERG A/K/A SHERYL BERG | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, INC. | |
| Appellant | No. 713 MDA 2015 |

Appeal from the Judgment Entered April 21, 2015
In the Court of Common Pleas of Berks County
Civil Division at No: 98-813

BEFORE: OTT, STABILE, JJ., and STEVENS, P.J.E.*

OPINION BY STABILE, J.:                    **FILED APRIL 09, 2018**

Appellant, Nationwide Mutual Insurance Company, Inc., appeals from the April 21, 2015 judgment against it on the bad faith claim of Appellee Daniel Berg, individually and as the executor of the estate of Sharon Berg a/k/a Sheryl Berg.[1] We vacate the judgment and remand for entry of judgment in favor of Appellant.

The trial court recited the following facts in its June 21, 2014 opinion and verdict:

> On September 4, 1996, Plaintiff, Sheryl Berg, the policyholder of a collision insurance contract with [Appellant], was

---

* Former Justice specially assigned to the Superior Court.
[1] We will refer to Mr. and Mrs. Berg as "Plaintiffs."

driving her 1996 Jeep Grand Cherokee, insured by [Appellant], when she was hit by another vehicle; fortunately, neither party was injured in the collision. The only issue in this sixteen-year-old case is if [Appellant] breached its fiduciary obligation to Plaintiffs. The ensuing litigation marathon is a significant factor found by this court in resolving the bad faith claim brought by Plaintiffs against [Appellant]. [Appellant's] fiduciary obligation to Plaintiff arose by the parties entering into a contract whereby the physical damage coverage for the collision required [Appellant] to, *inter alia*, 1) pay for the loss or 2) repair or replace the damaged parts.

[Appellant's] first damage estimate, dated September 10, 1996, concluded that [Appellant's] vehicle should be 'totaled,' the present value, at the time of the collision being $25,000. However, that was not the final resolution. [Appellant] vetoed this appraisal and a second estimate, ten days later, called for the Jeep to be repaired. This saved [Appellant] approximately half of the $25,000 expense to replace the Jeep. The repair process began immediately but took nearly four months until complete. [Appellant's] position to repair rather than total and replace the Jeep, never changed until the expiration of the lease in December 1998, twenty-eight months after the collision. Until [Plaintiffs] completed their remaining monthly payments on the lease agreement with Summit Bank, they were forced to drive what they claim is a defectively repaired Jeep. They further claim that the Jeep, after the four months of attempted repairs was not crashworthy, that it could not withstand a collision because of permanent frame damage. When all lease payments were paid by Plaintiff, [Appellant], in December 1998, suddenly changed its mind, totaled the car, and paid Summit Bank $18,000 to settle the claim and obtain ownership of the Jeep. [Appellant's] $12,500 repair quickly increased in total cost to [Appellant] to nearly double the replacement cost of $25,000. However, that increase has proven to be only a drop in [Appellant's] expenditure bucket. The parties have been in litigation for over 16 years and [Appellant] has paid in excess of one hundred times the original Jeep replacement costs in legal defense costs alone.

Trial Court Opinion, 6/21/14, at 1-2.

As is evident from the trial court's opinion, this case has a lengthy procedural history. Plaintiffs filed a writ of summons On January 23, 1998

- 2 -

against Appellant and Lindgren Chrysler-Plymouth ("Lindgren"), which initially handled the repair of the Plaintiffs Jeep (the "Jeep"). Pre-complaint discovery followed. On May 4, 1998, Plaintiffs filed a complaint against Appellant and Lindgren. Plaintiffs' causes of action against Appellant included breach of contract, negligence, fraud, conspiracy, violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2(4)(xxi), 1968 P. L. 1224, as amended, and insurance bad faith, 42 Pa.C.S.A. § 8371. Plaintiffs amended their complaint eight times, raising and ultimately abandoning a class action. Plaintiffs filed their eighth amended complaint on October 25, 1999. Ultimately, the parties proceeded to a jury trial on fraud, conspiracy, and UTPCPL actions. The jury trial commenced on December 13, 2004. The jury rendered a verdict in favor of Appellant and Lindgren on all causes of action except the catchall provision of the UTPCPL.[2] The jury awarded Plaintiffs $1,925.00 in compensatory damages from Lindgren and $295.00 from Appellant for the UTPCPL violation.[3] The basis for the jury's finding of a UTPCPL violation is not clear from the record.

_____

[2] The UTPCPL makes unlawful twenty-one specific instances of conduct considered to constitute "unfair methods of competition" and "unfair or deceptive acts or practices". The last of these instances is the catch-all provision that captures "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)(xxi).

[3] Lindgren paid compensatory damages and was dismissed from the case. Though not relevant to our decision to vacate the judgment, we find it telling

The second phase, a bench trial on UTPCPL treble damages[4] and bad faith, commenced on June 5, 2007. The trial court, Judge Albert A. Stallone, entered a directed verdict in favor Appellant on Plaintiffs' bad faith claim and did not treble the jury's $295.00 UTPCPL award. The trial court entered judgment on December 7, 2007, and Plaintiffs filed a timely appeal.

In an unpublished memorandum filed November 12, 2008, this Court concluded Plaintiffs waived all issues on appeal because they failed to serve the trial court with a copy of their Pa.R.A.P. 1925(b) statement. On October 22, 2010, a divided Supreme Court reversed and remanded. ***Berg v. Nationwide Mut. Ins. Co., Inc.*** 6 A.3d 1002 (Pa. 2010) (plurality).

After remand, this Court issued a published opinion concluding that the trial court in three respects erred in directing a verdict on Plaintiffs' bad faith claim. ***Berg v. Nationwide Mut. Ins. Co., Inc.***, 44 A.3d 1164 (Pa. Super. 2012) ("***Berg II***"). First, this Court observed that the trial court entered a directed verdict in Appellant's favor because it believed Appellant's "Blue Ribbon Repair Program"—the program through which Appellant referred Plaintiffs to Lindgren for vehicle repairs—was not a part of the insurance policy and therefore not subject to a bad faith claim. ***Id.*** at 1169. We concluded

---

that a case in which a jury found in favor of Appellant on all but one cause of action and awarded Plaintiffs only $295 has morphed into a judgment of more than $20 million on Plaintiffs' bad faith claim.

[4] 73 P.S. § 201-9.2(a), 1968 P.L. 1224, as amended.

that Plaintiffs' action against Appellant arises under an insurance contract in accord with section 8371, since insurers at all times must act in good faith towards their insureds regardless of whether loss claims are processed through a third-party repair facility or through a direct repair program. ***Id.*** at 1173. Second, the trial court held that Appellant's violation of the UTPCPL did not require a finding of bad faith. ***Id.*** We rejected this reasoning stating:

> The Bergs have not argued that the phase one jury's finding against Nationwide on the UTPCPL claim "was sufficient in and of itself to support a finding of 'bad faith' on Nationwide's part." To the contrary, the Bergs have consistently argued, in our view correctly, that the jury's finding that Nationwide violated the UTPCPL constitutes *some* evidence of bad faith conduct by Nationwide. In other words, because ***Romano*** [***v. Nationwide Mut. Fire Ins. Co.***, 646 A.2d 1228 (Pa. Super. 1994)] holds that bad faith conduct may be defined by reference to violations of statutes related to insurance practices, the jury's finding that Nationwide violated the UTPCPL constitutes some evidence of Nationwide's bad faith. Because the jury was not asked to specify precisely what conduct by Nationwide it found to be fraudulent or deceptive under the UTPCPL, the overall probative value of this evidence of bad faith may be somewhat limited.[5] But since a directed verdict may be granted "only where the facts are clear and there is no room for doubt," […] this evidence of bad faith was sufficient to preclude the entry of a directed verdict in Nationwide's favor.

_____

[5] As the prior panel of this Court noted, we are unable to address the UTPCPL violation directly because the record does not divulge the basis for the jury's UTPCPL verdict. Presumably, the factual basis for that verdict is subsumed within our extensive discussion of the parties' disputes and the trial court's findings of fact and conclusions of law.

*Id.* at 1175 (some citation omitted). Thus, while the UTPCPL violation was sufficient to avoid a directed verdict, it was not sufficient, in and of itself, to prove bad faith.[6] *Id.* Third, recognizing that when faced with a motion for directed verdict, a trial court must consider facts in a light most favorable to the nonmoving party and accept as true all evidence which supports that party's contention and **reject all adverse testimony**, we held it was error for the trial court to direct a verdict on the evidence introduced by Plaintiffs. *Id.* at 1170, 1175-76. Given the standard governing motions for directed verdict, we observed that Plaintiffs introduced evidence that Appellant sent the vehicle to another repair facility to avoid having to pay the cost of a total loss, Appellant returned the vehicle representing repairs had been successfully completed, even though its representatives had actual knowledge otherwise, and Appellant's utilized a "defense-minded" litigation strategy.[7] *Id.* at 1176. Accordingly, we remanded for a new trial where Plaintiffs again would have

---

[6] In the underlying case, the jury found that Nationwide did not commit fraud, only that there was some likelihood of confusion or misunderstanding to establish a violation of the UPTCPL. Importantly, the burden of proof under the UTPCPL is by a preponderance of the evidence. *See Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308 (Pa. Super. 2015). As stated, the burden of proof for bad faith under section 8371, is by clear and convincing evidence. The fact that the jury found a violation of the UTPCPL by only a preponderance of the evidence makes the case more compelling that Plaintiffs, if they were able, should have produced additional proof of bad faith to establish by clear and convincing evidence their claim under 8371.

[7] We explain, *infra*, under the standard governing motions for judgment notwithstanding the verdict, a review of all the record evidence in this case does not support these claims.

the burden to prove their bad faith allegations by clear and convincing evidence. *Id.*

The new trial took place in front of Judge Jeffrey K. Sprecher. Judge Sprecher heard the testimony of only four damage witnesses, **no additional evidence of bad faith by Plaintiffs**, and otherwise relied on transcripts from the prior proceedings. In a 42-page opinion and verdict issued on June 21, 2014, Judge Sprecher found in favor of Plaintiffs on their bad faith claim and ordered Appellant to pay $18 million in punitive damages and $3 million in attorney's fees. Appellant filed a timely post-trial motion seeking entry of judgment in its favor or a new trial. The trial court denied that motion on March 19, 2015. The trial court entered judgment on the verdict on April 21, 2015. This timely appeal followed:

Appellant raises four questions for our review:

1. Did the trial court err in finding, without record evidence much less clear and convincing evidence, and without hearing any of the relevant fact witnesses testify live, that Nationwide violated the insurance bad faith statute, where the record evidence showed, among other things: (a) the vehicle was repairable; (b) there was only one appraisal and it was not vetoed by [Appellant]; (c) [Appellant] was unaware of any problems with the vehicle when it was returned to [Plaintiffs]; and (d) [Appellant] did not delay the resolution of this matter by engaging in 'scorched earth' litigation pursuant to a claims manual and strategy that did not apply to [Plaintiffs'] claim?

2. Did the trial court err in awarding $18 million in punitive damages after a jury verdict of $295 when: (a) [Appellant] prevailed before the jury on [Plaintiffs'] common law fraud claim; (b) no one was hurt; (c)

- 7 -

[Plaintiffs] chose to drive the vehicle for months and thousands of miles after an expert told them it was supposedly unsafe; (d) [Appellant] paid the insurance claim in full; (e) [Appellant] disposed of the vehicle only after obtaining court permission to do so and after storing it for eight years: and (f) the trial judge included in his opinions lengthy diatribes reflecting animus against [Appellant] and the entire insurance industry?

3. Did the trial court err in awarding [Plaintiffs] $3 million in attorneys' fees based upon the fees incurred by [Appellant], rather than the lodestar method required under Pennsylvania Rule of Civil Procedure 1717, and without making numerous necessary deductions?

4. Did the trial court err in awarding interest on an award comprised solely of attorneys' fees and punitive damages, and not on the amount of the underlying insurance claim, which [Appellant] paid in full in 1998?

Appellant's Brief at 4.

We begin with an analysis of whether the trial court erred in finding that Appellant acted in bad faith under § 8371:

**§ 8371. Actions on insurance policies**

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

The following standard governs our review of the trial court's verdict:

Our review in a nonjury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the nonjury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Mohney v. Am. Gen. Life Ins. Co.*, 116 A.3d 1123, 1130, (Pa. Super. 2015 2015), *appeal denied*, 130 A.3d 1291 (Pa. 2015). Because Plaintiffs prevailed before the trial court, we view the evidence and all reasonable inferences therefrom in a light most favorable to Plaintiffs. *Rizzo v. Haines*, 555 A.2d 58, 61 (Pa. 1989).

Similarly, entry of judgment notwithstanding the verdict requires us to consider whether there was sufficient competent evidence to sustain the verdict. *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1141 (Pa. Super. 2006), *appeal denied*, 912 A.2d 838 (Pa. 2006). "Judgment notwithstanding the verdict "should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief." *Id.* We must not substitute our judgment for that of the factfinder on matters of credibility and weight of the evidence. *Id.*

The Pennsylvania General Assembly enacted § 8371 to protect insureds from bad faith denials of coverage. *Gen. Accident Ins. Co. v. Fed. Kemper*

*Ins. Co.*, 682 A.2d 819, 822 (Pa. Super. 1996). Thus, an insurer must act with utmost good faith towards its insured. **Berg II**, 44 A.3d at 1170 (citing **Dercoli v. Pennsylvania Nat. Mut. Ins. Co.**, 554 A.2d 906, 909 (Pa. 1989)). "The duty of good faith originates from the insurer's status as fiduciary for its insured under the insurance contract, which gives the insurer the right, *inter alia*, to handle and process claims." **Berg II**, 44 A.3d at 1170 (citing **Ridgeway v. U.S. Life Credit Life Ins. Co.**, 793 A.2d 972, 977 (Pa. super. 2002)). Bad faith applies to "those actions an insurer took when called upon to perform its contractual obligations of defense and indemnification or payment of a loss that failed to satisfy the duty of good faith and fair dealing implied in the parties' insurance contract." **Toy v. Metro. Life Ins. Co.**, 928 A.2d 186, 199 (Pa. 2007). "[I]n order to recover in a bad faith action, the plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis. **Rancosky v. Washington Nat'l Ins. Co.**, 170 A.3d 364, 365 (Pa. 2017). "[P]roof of an insurance company's motive of self-interest or ill-will is not a prerequisite to prevailing in a bad faith claim[,]" though such evidence is probative of the second prong of the bad faith test. **Id.** "The clear and convincing evidence standard is the highest standard of proof for civil claims[.]" **Grossi v. Travelers Pers. Ins. Co.**, 79 A.3d 1141, 1165 (Pa. Super. 2013). It "requires evidence clear, direct, weighty, and convincing as

to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of the precise facts in issue." *Id.*

"Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured." *Condio*, 899 A.2d at 1143. "[T]he fact finder needs to consider all of the evidence available to determine whether the insurer's conduct was objective and intelligent under the circumstances. *Berg II*, 44 A.3d at 1179. The insurer's conduct during litigation of a bad faith claim can itself support a finding of bad faith. *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 416 (Pa. Super. 2004) (*en banc*), *appeal dismissed*, 903 A.2d 1185 (Pa. 2006). Furthermore, "[a]n insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to 'send a message.' Rather, it has a duty to compensate its insureds for the fair value of their injuries." *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 382 (Pa. Super. 2002).

This Court will reverse a finding of bad faith where the trial court's "critical factual findings are either **unsupported by the record or do not rise to the level of bad faith**." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 502 (Pa. Super. 2004) (emphasis added), *appeal denied*, 872 A.2d 1197 (Pa. 2005). Furthermore:

> The [factfinder] may not be permitted to reach its verdict merely on the basis of speculation and conjecture, but there must be evidence upon which logically its conclusion may be based. Therefore, when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate

to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith.

*Id.* at 498 (quoting *Van Zandt v. Holy Redeemer Hosp.*, 806 A.2d 879, 886 (Pa. Super. 2002), *appeal denied*, 823 A.2d 145 (Pa. 2003)).

Insurers must cover insureds for the fair value of their loss. *See Toy*, 928 A.2d at 199; *Bonenberger*, 791 A.2d at 382. Here, Appellant covered the cost of repairs to the Jeep. Nonetheless, "the focus in section 8371 claims cannot be on whether the insurer *ultimately* fulfilled its policy obligations, since if that were the case then insurers could act in bad faith throughout the entire pendency of the claim process, but avoid any liability under section 8371 by paying the claim at the end." *Berg II*, 44 A.3d at 1178 (emphasis in original). Section 8371 concerns the "*manner* in which insurers discharge their duties of good faith and fair dealing during the pendency of an insurance claim[.]" *Id.* (emphasis in original).

Plaintiffs argue, and the trial court found, that Appellant acted in bad faith by repairing the Jeep rather than declaring the Jeep a total loss and compensating Plaintiffs for its value at the time of the loss. The parties agree that Lindgren did poor repair work. They dispute Appellant's role in and knowledge of the faulty repair job. In summary, the parties dispute (1) whether Appellant overrode Lindgren's initial total loss appraisal in order to save money; (2) whether Appellant forced Lindgren to repair the Jeep knowing the Jeep could not be restored to its pre-accident condition; (3) whether

- 12 -

Appellant allowed Lindgren to return the Jeep to Plaintiffs knowing the Jeep was not crashworthy and therefore not safe to drive; and (4) whether Appellant's subsequent conduct—including its conduct of this litigation—was an elaborate cover-up of its prior bad faith conduct. We will consider these findings in turn.[8]

**1. The Initial Appraisal.**

Douglass Joffred, the body shop manager for Lindgren, did the initial appraisal of the Jeep. N.T. Trial, 12/15/04, at 619, 622. Lindgren is part of Nationwide's Blue Ribbon Repair Program ("BRRP"), pursuant to which Nationwide refers its insureds to BRRP shops, and the shops in turn offer discounted repairs to Nationwide. *Id.* at 631, 708-09. Joffred testified that the Jeep initially appeared to him to be a total loss, but that he ultimately decided it was repairable:

> Q. You testified with regard to Plaintiffs' vehicle that when you first looked at it it quote on quote [sic] appeared to be a total loss; is that correct?
>
> A. Yes.

_____

[8] The trial court's organization of its findings on bad faith between its June 21, 14 Opinion and Verdict and its July 23, 2015 1925(a) Opinion do not align precisely, but the factual bases upon which the trial court found bad faith are the same. Similarly, the statement of questions presented by the Appellant and as restated by the Appellee do not align precisely. In substance, however, the matters in dispute are clear. We have offered our summary of the issues purely for organizing our discussion. We address the trial court's bases for finding bad faith throughout our discussion.

Q.   At that point you had not made a final determination, if in fact, the vehicle was a total loss?

A.   No.

Q.   You didn't really know one way or the other.  It was just a first impression?

A.   Correct.

[…]

Q.   Is it unusual in what you do to have a situation where maybe at first you think it might be a total loss then you decide it is not a total loss?

A.   No.

Q.   It happens?

A.   Yes.

*Id.* at 662-63.

Despite his first impression, Joffred stated he prepared a repair estimate on September 10, 1996.  *Id.* at 671; Trial Exhibit 6.  The printed estimate is dated September 20, 1996 and reflects $12,326 in parts and labor to repair the Jeep.  *Id.* at 674, Trial Exhibit 6, at 8.  Joffred testified that September 20, 1996 is the date the document was printed, not the date the estimate was prepared.[9]  *Id.* at 674, 691.  Joffred testified that his estimate did not change between September 10 and September 20, 1996.  *Id.* at 672.

_____

[9]  Joffred's testimony on Trial Exhibit 19 further reinforces this point.  Exhibit 19 is a supplemental estimate.  *Id.* at 679-80.  It is dated February 5, 1997. *Id.*  Lindgren returned the Jeep to Plaintiffs on December 30, 1996.  *Id.* Joffred testified that Exhibit 19 was printed on February 5, 1997 but depicts a

Doug Witmer was Nationwide's claims adjustor who handled Plaintiffs' claim. N.T. Trial, 12/14/04, at 293, 295. Witmer and Joffred discussed options for the Jeep, and Witmer received Joffred's $12,326 repair estimate. *Id.* at 303. Witmer believed the Jeep to be worth roughly $25,000 or $26,000. *Id.* at 338. Thus, the estimated cost of repair was roughly 50% of the actual cash value ("ACV") of the Jeep. *Id.* at 302-03; 336-37. Witmer said that if the repair costs approach 80% of a vehicle's ACV, the insurer will consider declaring a total loss. *Id.* at 336. In addition, Witmer and Joffred testified that a vehicle can be declared a "structural total loss," regardless of ACV, if the vehicle cannot be repaired to its pre-accident condition. *Id.* at 365; N.T. Trial, 12/15/04, at 629.

Appellant's claims log, produced as Trial Exhibit 8, includes several entries relevant to the initial appraisal of the Jeep's condition. An entry dated September 10, 1996 at 1:49 p.m. provides:

> LOSS Reassigned for COLL on Daniel G. & Sharon E <Berg from 58HARRBR26LIND – **TOTAL LOSS**. . .CAR IS AT LINDGREN. . . . **.THEY HAVE ESTIMATE**.

*Id.* at 67[10] (capitalization in original) (emphasis added). Another entry from 1:50 p.m. on September 10, 1996—one minute later—provides:

---

supplemental estimate prepared at an earlier date, when Lindgren was still in possession of the Jeep. *Id.* at 679-80, 692.

[10] We reference page numbers appearing in the upper right hand corner of each page of the claims log, just beneath "Print Date" and "Time."

SHOP ASKED FOR TEAR DOWN TIME TALKED TO RON GAVE OKAY
**IF TOTAL**. . . . SHOP WILL FORWARD ESTIMATE AND PHOTOS.

*Id.* (capitalization in original) (emphasis added); N.T. Trial, 12/15/04, at 677.

The claims log entry from 1:49 p.m. on September 10, 1996 evidences the existence of a repair estimate as of that date. The entry from 1:50 p.m. on September 10, 1996—by the words "if total"—evidences uncertainty as to whether the Jeep was a total loss or repairable. Witmer testified:

Q. And can you read that log note to the jury, please?

A. Says, Shop asked for tear down time. Talked to Ron. Gave okay, if total and a bunch of dots. Shop will forward estimate and photos.

Q. It says gave okay if total?

A. Correct.

Q. Does that suggest to you that maybe the car was not definitely a total?

A. Correct.

N.T. Trial, 12/14/04, at 331. Dean Jones, a managing claims consultant for Nationwide at the time, testified that the claims log entries do not confirm that the Jeep was a total loss and not repairable. N.T. Trial, 12/13/04, at 180, 213.

The 1:50 p.m. entry also includes the words "tear down time." A "teardown" is the disassembly of the vehicle to confirm whether it is a total loss, and to find any damage not apparent from a visual inspection. N.T. Trial, 12/14/04, at 332; N.T. Trial, 12/15/04, at 677-78. According to Witmer, a declaration of total loss is premature without a teardown. N.T. Trial,

12/14/04, at 332. A body shop gets compensated for teardown time if a vehicle turns out to be beyond repair. ***Id.***; N.T. Trial, 12/15/04, at 713.

Plaintiffs produced the testimony of George Moore, whose Penn-Del Auto Body shop was part of Nationwide's BRRP program from 1992 through 1997 or 1998. N.T. Trial, 6/5/07, at 61-62. Moore confirmed that a teardown is often necessary to determine whether a vehicle is a total loss. ***Id.*** at 80-81. Moore also testified that Appellant gave its BRRP shops a specific form to fill out in the event of an obvious total loss, and that the shop would not prepare a repair estimate in the event of an obvious total loss. ***Id.*** at 73, 81.

A claims log entry dated the following day, September 11, 1996 at 3:46 p.m., provides:

> "0140 EVALUATION OF DAMAGES: VEHICLE DAMAGE – Berg, Daniel G & Sharon E called b/s **they have est of 12k but feel veh should be a total loss** since unibody is twisted told wil insp-called ph at home told of assignment."

Trial Exhibit 8, at 65 (capitalization in original) (emphasis added). This last entry—created by Witmer—evidences a "12k" estimate that existed no later than September 11, 1996. It also evidences Witmer's understanding, as of September 11, 1996, that Joffred believed the Jeep could be a total loss despite Joffred's preparation of the "12k" repair estimate. Witmer testified that "called ph at home told of assignment" referred to Witmer's conversation with the policyholder, Plaintiff Daniel Berg. N.T. Trial, 12/14/04, at 356. Mr. Berg testified that he spoke to Joffred and Witmer and that he was aware that

- 17 -

Joffred initially believed the Jeep to be a total loss. N.T. Trial, 12/15/04, at 725-26.

Mr. Berg's testimony on the matter is somewhat contradictory. Initially, he testified that he wanted the Jeep to be repaired and that he told Joffred so:

Q. What were you told about your vehicle:

A. I was told by Mr. Joffred that it was a total loss and that, you know, that that was, I believe, the initial conversation.

Q. Did he tell you that he had appraised the vehicle as a total loss?

A. Yes, he did, uh-huh.

Q. He did?

A. Uh huh.

Q. And did you tell him you wanted the vehicle repaired?

A. I did, yes.

THE COURT: You told him you wanted it repaired?

THE WITNESS: Yes, correct.

THE COURT: Did you tell him that before he said it was a total loss or after?

A No, I think it was afterwards, I believe so.

THE COURT: In other words, you told him you would like to have it repaired before it was totaled?

THE WITNESS: Let's start over with that again because this is our eight year process but we want to make sure we are correct. We had a conversation. I thought it was a total loss and Mr. Joffred, I believe, agreed with me at that point. At some point the folks at Nationwide became involved.

Q. Did you speak with anyone from Nationwide about the condition of your vehicle?

A. I did. I was given I believe it was a [sic] Doug Witmer and his – the conversation was very short. And this may have been several days after this initial – I'm not sure. It could have been two, three, four days he said they are going to repair the vehicle.

*Id.* at 725-27.

The following day, Mr. Berg retracted his testimony about wanting the Jeep repaired:

Q. You testified yesterday that when the car was taken to Lindgren you wanted the car repaired, right?

A. No, that was backwards. I had changed that initially.

Q. You first wanted it totaled?

A. It was Mr. Joffred who said the vehicle is totaled and then it was overruled, I believe, by the Nationwide folks. And at that stage I commented that I can't believe they are fixing that vehicle, but there is no one here that is going to stand up to Nationwide so I dropped it at that point. That's pretty much the criteria.

N.T. Trial, 12/16/04, at 808.

Ultimately, Joffred and Witmer decided to send the Jeep to another shop, K.C. Auto Body, to have the frame repaired. If K.C. Auto Body was able to repair the frame, Lindgren would complete the remaining repairs to the Jeep. Joffred explained:

Q. You recall Doug Witmer from Nationwide coming out and looking at the vehicle with you, the Berg's vehicle?

A. Somewhat, yes.

Q.      Do you remember discussing essentially what you are going to do to get this car repaired?

A.      Yes.

Q.      Mr. Witmer never told you at any time that this vehicle had to be repaired, did he?

A.      No.

Q.      He never twisted your arm and said there is no way that this is a total loss?

A.      No.

Q.      You both agreed, didn't you, that at least initially you would send the car out to have the frame pulled at K.C.?

A.      Correct.

Q.      See how it came back?

A.      Correct.

Q.      At least at that time you were of the opinion that it was worth a try to send the car out to have the frame pulled?

A.      Yes.

Q.      It wasn't definitely a total loss at that point?

A.      No.

Q.      And Nationwide didn't do anything to force you to do that?

A.      No.

*Id.* at 681-82. Joffred further testified that subletting a portion of a repair is common industry practice. *Id.* at 683, 698. Upon the return of the Jeep from K.C. Auto Body to Lindgren, Joffred believed the Jeep was repairable. *Id.* at 684.

Witmer's account of the conversation is consistent with Joffred's:

> Q. Did you have a conversation with Mr. Joffred?
>
> A. Yes. Yeah, we – he took me out to the shop. I inspected the vehicle, went over the estimate that they had prepared. During the course of the conversation he had mentioned that they don't have the machinery to repair the vehicle. I said, well, then it needs to go to a shop that can do these repairs primarily dealing with the structural or unibody repairs to the vehicle.

N.T. Trial, 12/14/04, at 338-39.

Witmer denied forcing Lindgren to repair the vehicle rather than declare

it a total loss:

> Q. So does Mr. Joffred agree that the vehicle should be sent out, sublet to K.C. to have the frame pulled?
>
> A. Yes.
>
> Q. Did he at any time say, no, I'm not doing this, this car is a total loss?
>
> A. No.
>
> Q. At any time during your conversation with Mr. Joffred did he demand that this car was a total loss?
>
> A. No.
>
> [...]
>
> Q. Did you insist the vehicle was a total loss?
>
> A. No.
>
> Q. Did you technically override Mr. Joffred's decision to total loss this car?
>
> A. No.
>
> Q. Were you both in agreement that the vehicle should be sent to K.C. to have the frame repaired?
>
> A. Yes.

Q.     And what was your understanding with Mr. Joffred if the
       vehicle came back from K.C. and the frame looked okay,
       what was the game plan?

A.     Well, then when the vehicle came back from its necessary
       repairs then they would complete the job as far as putting
       the parts on, painting the vehicle, and refinishing it.

*Id.* at 341.

The trial court found that Joffred, on September 10, 1996, appraised the car as a total loss. Opinion and Verdict, 6/21/14, at 3, 5, 10-11, 13-14. The trial court also found that Appellant vetoed Joffred's total loss appraisal and forced Lindgren to send the Jeep to K.C. Auto Body for repairs. *Id.* at 4-6, 10-11, 13-14. According to the trial court, Trial Exhibit 6—the $12,326 repair estimate—was prepared on September 20, 1996 after Witmer vetoed Joffred's total loss assessment.

In summary, the record contains no support for a finding that Witmer, on behalf of Appellant, "vetoed" Joffred's total loss appraisal.[11] In many

_____

[11] The Dissent's argument to the contrary fails to account for the voluminous evidence, set forth above, that contradicted the trial court's finding. In summary, Joffred perceived a total loss upon first sight of the Jeep, but he also prepared a repair estimate. After investigation, including a tear down of the Jeep, he concluded the Jeep was repairable.

We acknowledge the applicable standard of review. The record before us is voluminous, consisting of thousands of pages of transcripts and exhibits from proceedings spanning nearly two decades. As we will explain in further detail throughout this opinion, we do not believe that we are required, under the guise of drawing reasonable inferences in favor of the plaintiff, to ignore a large body of evidence that contradicts the trial court's findings. This is especially so where the plaintiffs were required to prove their case by clear and convincing evidence.

respects, the record contradicts that finding. Joffred testified that he prepared his repair estimate on September 10, 1996 and entered it into a computer system. Joffred explained that Trial Exhibit 6 is dated September 20, 1996 because it was printed on that date. Even if the trial court disbelieved some or all of Joffred's testimony, Appellant's claims log shows that an estimate was prepared as of September 10, 1996, and a claims log entry from September 11, 1996 refers to a "12k" estimate. The claims log entries from September 10 and 11, 1996 also confirm that the fate of the Jeep was uncertain pending a teardown. Witnesses for both parties confirmed that a teardown is common prior to declaring a vehicle a total loss. The trial court, in both its June 21, 2014 opinion and verdict and its July 22, 2015 Pa.R.A.P. 1925(a) opinion, largely ignored the pertinent claims log entries quoted above.

Instead, Appellant and the trial court rely on Witmer's claims log entry of September 24, 1996 at 3:24 p.m.:

> REPAIRS ARE APPROXIMATELY 50% of ACV NATIONWIDE WILL NEVER RECOVER THE DIFFERENCE IN SALVAGE VALUE—THANKS DOUG.

Trial Exhibit 8, at 65 (capitalization in original). The trial court therefore found that Appellant "vetoed" Joffred's total loss assessment in order to save money. Opinion and Verdict, 6/21/14, at 5-6, 15, 26. The record supports a finding that Appellant deemed repairs more cost effective than a total loss. This, in and of itself, is not bad faith. Indeed, Witmer acknowledged that Appellant's decision to repair or total a vehicle depends upon the cost of repair in relation

to the vehicle's cash value. N.T. Trial, 12/14/04, at 336-37. Witmer also acknowledged that a total loss appraisal always triggers additional investigation from an insurer. *Id.* at 353-54.

Plaintiffs' witness Moore also addressed salvage value. "Salvage value is the remaining value of a car after the settlement has been done where they then salvage amount [sic] to the various salvage yards. They dismantle the cars and they sell the parts on them to regain their investment." N.T. Trial, 6/5/07, at 84. Asked if salvage value is "part and parcel of the total loss evaluation," Moore responded "Yes." *Id.* Moore also agreed that there is "nothing wrong" with considering salvage value in determining whether a car is a total loss and that "most of the times" the insurer determines whether a vehicle is a total loss. *Id.* at 85, 88.

In *Bonenberger*, we wrote that an insurer may not look to its own economic considerations in order to deprive the insured of the fair value of its claim. *Bonenberger*, 791 A.2d at 382. We do not read *Bonenberger*, which involved a soft tissue injury, to preclude an insurer from employing a formula to determine whether a damaged automobile, based on its ACV, is an economic total loss. In other words, we do not believe *Bonenberger* prohibits an insurer to consider costs in determining whether to total or repair an automobile. The question, which we will address more fully in the next section, is whether Appellant prioritized cost savings knowing that the Jeep could not be repaired to its pre-accident condition.

We conclude that the evidence of record, set forth extensively above, does not support the trial court's finding that Witmer overrode or vetoed Joffred's total loss appraisal.[12] The record indicates that, as of September 10 and 11, 1997, Lindgren and Appellant contemplated further investigation.Likewise, the record does not support the trial court's finding that Joffred prepared the $12,326 repair estimate on September 20, 1996 in response to Witmer's veto. The claims log evidences that a "12k" repair estimate existed no later than September 11, 1996. The trial court did not find that the claims log was falsified or altered in any way. The record also confirms that a potential total loss normally triggers further investigation from an insurer. The trial court simply ignored a large body of evidence that rendered its findings unsupported.[13]

---

[12] Plaintiffs' counsel consistently used the word "override" in his questions: "Q. And you overrode that decision to total loss the vehicle; is that correct? A. Well, I would clarify that, if I may?" N.T. Trial, 12/14/04, at 301. "Q. Now your decision to override this total loss appraisal by the assigned appraiser at Lindgren was based also on an inspection of the vehicle? A. Correct." *Id.* at 305. As set forth in the main text, the documentary evidence and all witnesses from both sides indicated that it is common practice for an insurer to investigate and make a final decision as to whether a damaged vehicle is a total loss. There is no evidence Witmer forced Lindgren to repair a vehicle Joffred believed to be beyond repair.

[13] In its July 23, 2015 opinion, the trial court found that Appellant violated several laws governing the insurance industry:

> 3) Was there a violation of the Uniform Insurance Practices Act and Unfair Claims Practices Act [*see* 41 P.S. § 1171.1, *et*

**2. Was the Jeep repairable?**

The trial court noted that two body shops—K.C. Auto Body and Lindgren—tried and failed to repair it. Trial Court Opinion, 7/23/15, at 6, 10. The trial court also noted the testimony of Plaintiffs' expert, Donald Phillips. *Id.* Phillips provided extensive testimony on the faulty repairs of the Jeep, but he did **not** opine on whether the Jeep was repairable. William Anderton, an expert witness for Appellant, also confirmed that Lindgren did not repair the Jeep properly. He testified, however, that the Jeep was repairable and not a total loss:

> Q.  With regard to the issue of whether or not the vehicle was a total loss prior to it being repaired do you have an opinion as to a reasonable degree of certainty on that issue?
>
> A.  I am reasonably – I'm very certain that the vehicle should not have been declared either as a structural or economic total loss.

---

*seq.*, 1974 Pa. Laws 589]? Yes, as determined by a jury under the then existing facts of the 2004 trial.

4) Was there a violation of the Motor Vehicle Physical Damage Appraiser Act [*see* 63 P.S. § 851, *et. seq.*, 1972 Pa. Laws 1713]? Yes, as determined by this court in our non-jury bad faith trial.

Trial Court Opinion, 7/23/15, at 36. Paragraph 3 is incorrect in that the jury found a violation of the catchall provision of the UTPCPL. The trial court made no specific findings of violations under the Uniform Insurance Practices Act or the Appraiser Act. To the extent the trial court's findings that Appellant violated these Acts rest on Appellant's initial handling of the claim, we conclude the trial court erred for the reasons set forth in this section. Similarly, to the extent any violation of the aforementioned Acts rested on the trial court's findings that Appellant forced Lindgren to repair an irreparable vehicle, we address that issue in the next section.

Q. Why do you say that?

A. Based upon the parts that were installed in the vehicle, the condition of the parts that were not installed in the vehicle, and the general activities, repair activities that were involved would not have constituted an economic factor that would have brought the value of the repair beyond what would have been considered an economic total loss.

There was nothing unusual about the repairs. They used the commonly stocked components that were available at the Chrysler dealership for the repair and those components were not enough not the installation was not intricate enough to cause any additional anything that would have made it a structural total loss and the parts of the vehicle beyond the repairs were done on the front end to the firewall and "A" pillars and stuff. The floor of the vehicle, there was limited – no damage there.

N.T. Trial, 12/16/04, at 881-82. Anderton also testified that the Jeep could have been repaired properly with the parts and labor described on Joffred's repair estimate. *Id.* at 883. Anderton also testified that it was not unusual for a body shop to sublet a portion of the repairs. *Id.*[14]

In addition, David Wert, a former Lindgren employee who testified for Plaintiffs, confirmed that the Jeep was repairable:

Q. I said he believes that under the right circumstances this vehicle could have been repaired safely.

[Plaintiffs' Counsel]: I'm going to object, Your Honor, He didn't have a chance to review any of the estimates or repair documents and wasn't requested to do a review in this matter. .

_____

[14] As the trial court noted, Anderton agreed that the Jeep should not have been returned to Plaintiffs without proper repair. *Id.* at 896; Trial Court Opinion, 7/23/15, at 8. As we explain in the main text, evidence of improper repair is not evidence that the Jeep was beyond repair.

THE COURT: Objection is overruled. Is that your belief that it could have been repaired safely? Do you have an opinion? If you don't, you don't have an opinion.

THE WITNESS: Yes, it could have.

Q. I am sorry?

A. Yes, it could have been repaired correctly under the right circumstances. It could have.

Q. But your testimony is that Lindgren did not repair it correctly?

A. Correct.

N.T. Trial, 12/15/04, at 560.

In summary, the witnesses who addressed the matter testified that the Jeep was repairable. Furthermore, even if the trial court disbelieved Anderton's and Wert's testimony on this point, the record contains no evidence to support a finding that the Jeep was beyond repair. Plaintiffs bore the burden of proving Appellant's bad faith by clear and convincing evidence. They produced no evidence that the Jeep was beyond repair. The record confirms only that Lindgren and/or K.C. Auto Body failed to repair the Jeep properly. The record, viewed in a light most favorable to Plaintiffs, does not support a finding by clear and convincing evidence, that the Jeep was beyond repair.[15]

---

[15] The Dissent would conclude otherwise because the Jeep remained in poor condition after a lengthy repair. We believe the Dissent misapplies the standard of review by drawing inferences against the evidence of record. The evidence uniformly establishes that the Jeep was repairable, but the repair

### 3. Was Appellant aware of the Jeep's condition upon its return to Plaintiffs?

Plaintiffs also claimed that Appellant acted in bad faith because it knew Lindgren returned the Jeep to Plaintiffs in an unsafe and uncrashworthy condition, and the trial court so found.[16] The record supports the trial court's finding that the vehicle was not crashworthy. Plaintiffs' expert witness testified that safety features including the airbags and front crumple zones would not respond as designed in the event of a subsequent crash. N.T. Trial, 12/14/04, at 446. The trial court was entitled to believe this evidence and disbelieve other testimony indicating that the Jeep was safe to drive.[17] The question is whether Plaintiffs proved by clear and convincing evidence that Appellant knew of the Jeep's condition or acted with reckless disregard of its obligations to its insured in permitting Lindgren to return the Jeep to Plaintiffs. *Condio*, 899 A.2d at 1143.

_____

was done poorly. The Dissent draws an inference that simply is belied by the evidence, including witness testimony from both parties.

[16] As noted above, the trial court in conclusory fashion found Appellant to be in violation of the Motor Vehicle Physical Damage Appraiser Act without any specific findings of statutory violations. We observe that § 861 of the Act requires, among other things, that "[b]ecause an appraiser is charged with a high degree of regard for the public safety, the operational safety of the vehicle shall be paramount in considering the specification of new parts." 63 P.S. § 861(b). To the extent the trial court's finding of a violation of this Act rested on the condition of the Jeep upon its return to Plaintiffs, this section addresses that finding.

[17] Appellant's expert Anderton testified that the Jeep was safe to drive and crashworthy. N.T. Trial, 12/16/04, at 885.

The trial court found "[Appellant] did inspect the Jeep and even if it did not as it claims, it should have. It had a duty to the customer to do so. Lindgren is [Appellant's] Blue Ribbon Repair shop." Opinion and Verdict, 6/21/14, at 12. The trial court also found that Appellant's "BRRP claim managers performed routine monthly inspections of the repairs throughout the extended, four-month period [of repair of the Jeep] per standard BRRP procedure." Opinion and Verdict, 6/21/14, at 16. "The title of Appellant's personnel performing random inspections of [Appellant's] personnel performing random inspections of [Appellant's] Blue Ribbon facilities was Property Damage Supervisor and/or Property Damage Specialists (PDS)." *Id.* "Damage that showed the Jeep was not repaired properly must have been visible to PDS during the repair period." *Id.* The trial court believed the faulty repairs "must have been visible" because of the extensive failures detailed by Phillips, Plaintiffs' expert witness, and Stephen Potosnak, one of Appellant's Property Damage Specialists. *Id.* at 16-18.

Potosnak became a PDS, or "reinspector," for Appellant in November of 1997, while the Jeep was under repair. N.T. Trial, 12/14/04, at 371-72. He was in charge of inspecting Lindgren's estimates. *Id.* Potosnak described the duties he performed for Appellant:

THE COURT: He was an employee of Lindgren at the time?

THE WITNESS: No. Let me clarify that. I was basically the reinspector for Nationwide Insurance that went into Lindgrens to look at how their estimates were going and how they were doing.

- 30 -

[PLAINTIFF'S COUNSEL]: Would you do this several times a month, correct?

A. That's correct, yes.

Q. Did you provide monthly performance evaluations for the shop to fill out?

A. Yes.

Q. The sole purpose was all on cost containment, correct?

[DEFENSE COUNSEL]: Objection.

THE COURT: What's the objection?

[DEFENSE COUNSEL]: To the reference to cost containment and relevancy. ]

THE COURT: Overruled.

THE WITNESS: Based on accuracy, and how they were generating their estimates, yes.

Q. So on the written reports there was no way to measure quality of repairs, correct?

A. The only way the quality repairs were basically checked I only saw them on the front side when the vehicle was damaged. I reinspected the vehicle, went over the estimate with the shop, made sure everything was in line. Very rarely did I see them on the backside unless there was a complaint on the vehicle.

Q. Sir, again, my question is, the written reinspection reports do not have any criteria to measure the quality of repairs in terms of what the Bergs would expect in quality, correct?

A. Again, only if there was a complaint filed where we were addressing any type of quality issues.

*Id.* at 372-73. In summary, Potosnak testified that his duty as a PDS was to inspect newly damaged vehicles and examine the body shop's repair estimate. He did not monitor the quality of an ongoing repair job.

In contrast, Dean Jones, Plaintiffs' claims consultant at the time, testified that the purpose of Appellant's reinspections "was to ensure that the vehicles were being repaired properly." N.T. Trial, 12/13/04, at 242-43. Jones testified that Nationwide's Blue Ribbon Repair Program includes a guarantee on the equality of repairs. *Id.* at 231.

The trial court also cites George Moore, of Pen-Del Auto Body, to establish that Appellant required its BRRP shops to maintain control logs. Trial Court Opinion, 7/23/15, at 7. Moore explained that Appellant had its BRRP shops maintain a shop control log available for Appellant to inspect. N.T. Trial, 6/5/07, at 63-64. Appellant's reinspectors, or "property damage supervisors," would occasionally visit the BRRP shops and examine the control logs. *Id.* at 64, 71. Moore testified that Appellant's reinspectors monitored the time of completion rather than the quality of repairs. *Id.* at 76.

Plaintiffs' witness David Wert was a Lindgren employee during the repair of the Jeep, though he did not work on it. N.T. Trial, 12/15/04, at 538-39.[18] He testified as follows:

> Q.   During this time period did Nationwide regularly visit the repair shop?

---

[18] Wert testified that Lindgren terminated his employment in August of 1997, and that his departure was not amicable. *Id.* at 536, 557. In October or November of 1997, several months after his departure from Lindgren, Wert contacted Plaintiffs and reported his observations of what he believed to be improper repairs. *Id.* at 538, 555. Wert acknowledged that he was unhappy with Lindgren when he called Plaintiffs. *Id.* at 566-67.

A.    I'd say just about every major job done through Nationwide, especially if you were on one of their programs, they come in and check the car and see how the progress was and things like that.

Q.    Did you have an opportunity to witness Nationwide personnel going over the repairs of this particular vehicle?

A.    Yes, I did.

Q.    How long did that take place?

A.    I can't really say.

Q.    Was it more than a five minute review?

A.    Oh, yes.  Yes, they had the paperwork, the estimates, were going through it, and checking the parts and just looking it over and things like that.

Q.    Was this later in repairs or earlier in the repairs?

A.    In the early stages.

[…]

Q.    Did you happen to witness any other Nationwide employees looking at the vehicle at any point after that again?

A.    No.

*Id.* at 547-48.

Wert went on to clarify that Nationwide employees were in and out:

THE WITNESS:  "They [Nationwide employees] were in and out all the time."

THE COURT:  One major time?

THE WITNESS:  Yes.

THE COURT:  In and out on other occasions as well?

THE WITNESS:  Yes.

THE COURT:  -- with regard to the Berg vehicle?

- 33 -

THE WITNESS: Yes.

*Id.* at 549.

Thus, Wert confirmed Potosnak's testimony that a detailed inspection took place at the beginning of the Jeep's repair to assess the accuracy of Lindgren's parts and labor estimate. According to Wert, Appellant's representative who performed the inspection at the early stages of the repairs did not appear to be happy with the rate of progress. *Id.* at 551-53. Wert also testified that one or more of Appellant's adjustors visited Lindgren near the end of the Jeep's repairs. *Id.* at 552. The trial court cited Wert's testimony that he saw personnel from Appellant looking at the Jeep when it was near completion. Trial Court Opinion, 7/23/15, at 7. Wert did not describe the nature and extent of what these adjustors did, nor did he describe the condition of the Jeep when they were present.[19] Expert testimony documenting the faulty repairs required partial disassembly and/or placing the

---

[19] At oral argument, Plaintiffs' counsel stated that Wert testified that Appellant knew the repairs were not done properly, citing trial court finding of fact 42. Trial Court Opinion, 6/23/14, at p. 16, finding of fact 42 ("[Appellant] knew the repairs failed before the vehicle was released to the Plaintiffs because its BRRP claim managers performed routine monthly inspections of the repairs throughout the extended, four-month period per standard BRRP procedure.") In their brief, Plaintiffs' state that Appellant's personnel conducted quality inspections and were unhappy with what they observed. Plaintiffs' Brief at 49. Our review of the record reveals no support for the trial court's finding of fact or for Plaintiffs' assertions. Rather, Wert testified that Appellant's personnel were in an out occasionally and were unhappy with the length of time it took to complete the repairs. N.T. Trial, 12/15/04, at 548-52. Wert did not address Appellant's knowledge or opinion of the quality of the repair work.

Jeep on a lift to observe the defects. *See* Trial Exhibit 8, at 4-5. The record contains **no evidence** that the extent of the faulty repairs would have been evident during a visual inspection when the repairs were nearly complete, much less that Appellant knew or should have known about the faulty repairs.

Finally, the court cited the testimony of Michal Grumbein, another PDS for Appellant. Trial Court Opinion, 7/23/15, at 7. The court noted that Grumbein did "random inspections" of BRRP shops for Appellant. *Id.*; N.T. Trial, 12/13/04, at 102-03. Grumbein confirmed that the random inspections were to ensure that body shops prepared fair estimates. N.T. Trial, 12/13/04, at 72, 103, 109-10. Grumbein stated that Appellant's PDS personnel "really weren't looking for deficiency [in repairs]. We were just making sure the estimate was written correctly." *Id.* at 105. If, however, they detected a mistake such as improper paint match, they would ask the shop to correct it. *Id.* at 105-06. Grumbein had no involvement in Plaintiffs' claim. *Id.* at 123. Witmer confirmed that Appellant would have been sending reinspectors to Lindgren during the four-month repair period, but he did not testify whether any of those inspections involved the Jeep. N.T. Trial, 12/15/04, at 240-41.

In summary, the record does not support a finding that Appellant had actual knowledge of or recklessly disregarded any knowledge of the Jeep's condition when Lindgren returned it to Plaintiffs. Potosnak inspected Lindgren's estimate of the cost of parts and labor, but did not inspect the quality of the ongoing repair Job. Wert testified that one or more unidentified

personnel from Appellant were present when the Jeep's repair was nearly complete, but the record does not evidence what those people saw, or whether the faulty repairs would have been observable when the repair job was nearly complete.

We now turn to the trial court's finding that Appellant should have been aware of Lindgren's faulty repairs. The trial court found: "[Appellant] did inspect the Jeep and even if it did not as it claims, it should have." Opinion and Verdict, 6/21/14, at 11-12. In support of its finding, the trial court relied on the testimony of expert witness James Chett. Plaintiffs offered Chett as an expert in insurance claims handling. N.T. Trial, 6/6/07, at 153. Chett opined that insures have an obligation to make sure vehicles are repaired safely. *Id.* at 177. Chett also acknowledged that insurance companies do not repair cars, but rather pay for car repairs. *Id.* at 207. Appellant's contractual obligation under the policy in this case was to pay to repair the Jeep. *Id.* With regard to Plaintiffs' Jeep, Chett testified as follows:

> Nationwide, in my opinion, I mean, this was a car that was hit hard and the body was twisted and there was a question of whether or not this was a total loss or not a total loss. And it was decided to take the car and send it to K.C. Auto, which I believe was the shop that pulled the frame out and straightened out the unibody. When you have a car that's hit that badly, to me, it's reasonable to resinspect the repairs when they're completed to make sure the car is safe. You know, it's like this quality control on most products that are made, and I would expect there would have been some quality control with that car.
>
> Now I do know from being at Aetna we had these—called them approved shops, but our appraisers were in and out of them all the time. They had desks there. They had computer outlets

- 36 -

there. They had telephones there and they would constantly reinspect the repairs on a car. The last thing they want is to get called is for a supplement, which means have to go back out and look at the car and the shop has to repair the car. So to me it was reasonable with a car hit that badly people from Nationwide being there. It was reasonable to inspect the car and make sure the repairs were properly done.

*Id.* at 217-18.

In addition, Witmer testified that Lindgren expected the repair job to take 25½ days. N.T. Trial, 12/15/04, at 310. Instead, it took four months. Dean Jones testified that Appellant's personnel sometimes conducted inspections to ensure the quality of repairs and that the BRRP included a guarantee of repair quality. Given these facts, perhaps Appellant should have inquired about the reason for the delay in completing repairs. Nonetheless, the record contains no evidence supporting a conclusion that a longer-than-anticipated repair process is indicative of poor repair work. Further, the appropriate timing of any additional inspection(s) is a matter of speculation. Whether and to what extent the faulty repairs would have been evident in a visual inspection by an insurance company employee also is a matter of speculation. The Bergs' Eighth Amended Complaint alleged that Appellant, through its BRRP program, promised to restore an insured vehicle to pre-accident condition "within repair industry standards" and to remedy any departure from such standards. Eighth Amended Complaint, 10/25/99, at ¶ 44(j). Appellant did not promise to inspect an insured vehicle prior to its return. In these circumstances, we cannot conclude that Appellant's failure

to inspect Lindgren's repair work amounts to bad faith. Neither the trial court, the Bergs, nor the Dissent, cite any legal authority supporting a conclusion that an insurer's duty of good faith and fair dealing encompasses an inspection of repairs prior to returning a vehicle to an insured.[20] Even were we to find such a duty, the evidence here does not rise above negligence, much less support a finding of bad faith by clear and convincing evidence. Further, we will reverse the trial court's finding of bad faith when its "critical factual findings are either unsupported by the record or do not rise to the level of bad faith." **Brown**, 860 A.2d at 502; **see also**, **Condio**, 899 A.2d at 1150. Such is the case here, as the instant record does not support a finding, by clear and convincing evidence, that Appellant could or should have discovered Lindgren's poor work given the facts of this case.

### 4. Appellant's conduct after Lindgren returned the Jeep to Plaintiffs

The trial court found that Appellant acted in bad faith in purchasing and disposing of the Jeep after Plaintiffs complained about the poor repair job. The trial court also found that Appellant acted in bad faith throughout the course of this litigation.

The record reflects that Plaintiffs returned the Jeep to Lindgren several times for additional repairs. On January 2, 1997, two days after Lindgren

---

[20] Given its potentially significant ramifications, we do not believe that an intermediate appellate court is the appropriate body to pronounce, based on the testimony of a single witness, that such a duty exists.

returned the Jeep to Plaintiffs, Plaintiffs took the vehicle to Lindgren because the headlights were malfunctioning. N.T. Trial, 12/15/04, at 727. Mr. Berg also noted a "clunking" sound in the front end when he turned the wheels left or right. *Id.* Mr. Berg also testified that, "over a three month period" the Jeep "seemed to want to walk one direction or the other [...] and it got to the point where the tires frayed down to the metal." *Id.* at 728. Subsequently, Mr. Berg received a call from Wert (Lindgren's former employee who contacted Plaintiffs after his termination from Lindgren). *Id.* Wert informed Mr. Berg of Lingren's poor repair job, and Plaintiffs retained counsel. *Id.* Mr. Berg did **not** contact Appellant about these problems. *Id.* at 728, 753. After these additional repairs the Jeep was "driving fine" and Plaintiffs "drove it a lot." *Id.* at 754.

For further analysis, we find the following timeline useful.

- December 31, 1996: Lindgren returns the Jeep to Plaintiffs (N.T. Trial, 12/15/04, at 727).

- November 3, 1997: Plaintiffs' counsel writes a letter to Witmer informing him of Plaintiffs' intent to file suit against Lindgren. The Letter also offers Appellant an opportunity to inspect the Jeep. Trial Exhibit 7.

- November 25, 1997: Phillips inspects the Jeep for Plaintiffs. N.T. Trial, 12/14/04, at 440.

- January 23, 1998: Plaintiffs commence litigation against Lindgren.

- April 22, 1998: Plaintiffs' write a letter to Appellant offering an opportunity to inspect the Jeep. Trial Exhibit 11; N.T. Trial, 12/15/04, at 760; N.T. Trial, 12/16/04, at 793.

- April 28, 1998: Potosnak inspects the Jeep and notes many deficiencies in the repair job. Trial Exhibit 8, at 4-5.

- May 4, 1998: Plaintiffs commence litigation against Appellant.

- May 19, 1998: Appellant offers to have the Jeep repaired at a body shop of Plaintiffs' choice or purchase the Jeep after inspection by an independent expert. Trial Exhibit 15, N.T. Trial, 12/16/04, at 797.

- August 21, 1998: Anderton visually inspects the Jeep on behalf of Appellant. N.T. Trial, 12/16/04, at 876.

- January 8, 1999: Appellant purchases the Jeep upon the conclusion of Plaintiffs' lease.

- April 20, 1999: Anderton performs a detailed inspection of the Jeep on Appellant's behalf. N.T. Trial, 12/16/04, at 879.

The trial court faulted Appellant for not immediately apprising Plaintiffs of the results of Potosnak's April 28, 1998 inspection. Opinion and Verdict, 6/23/14, at 7. "No one told Plaintiffs that Defendant will fix the problems immediately, that Plaintiffs should take the Jeep to any body shop to repair it,

and that Defendant would pay the cost. No one from Nationwide warned Plaintiffs that the Jeep should not be driven." *Id.*

Given the timeline above, we do not understand the significance of Appellant's failure to inform Plaintiffs of Potosnak's report. Plaintiffs' expert inspected the Jeep in November of 1997 and found it unsafe to drive. Plaintiffs commenced litigation against Lindgren in January of 1998. Plaintiffs were aware of the Jeep's condition five months before Potosnak inspected it in April of 1998. Plaintiff's counsel informed Appellant by letter of November 3, 1997, that Plaintiffs intended to sue Lindgren. Trial Exhibit 7. In other words, Plaintiffs were aware of the problems with the Jeep, and Appellant knew Plaintiffs were aware of the condition of the Jeep, well before Potosnak's inspection. Potosnak's notes in the claim log did not indicate whether the Jeep was unsafe to drive. Trial Exhibit 8, at 4-5. The record, therefore, does not show that Appellant jeopardized Plaintiffs' safety by failing to inform them of the results of Potosnak's inspection.

Two weeks after Plaintiffs filed suit against Appellant, Appellant asked for permission to have an independent expert inspect the Jeep, after which Appellant would pay to have the Jeep repaired at a shop of Plaintiff's choice or purchase the Jeep if it could not be repaired.[21] Trial Exhibit 15 (Letter of

_____

[21] It is unclear whether the poor repair job might have rendered further repairs impossible, or whether Appellant was mistaken in concluding the Jeep was repairable in the first place. We have explained in detail the absence of

May 19, 1998). Anderton, the Appellant's independent expert, was permitted **only** a visual inspection by Plaintiffs until after Appellant purchased the Jeep upon the termination of Plaintiffs' lease. The record therefore does not support a finding that Appellant failed to attempt to resolve this dispute in its early stages, or that it refused to have the Jeep repaired or purchased.

The trial court also faulted Appellant for its purchase of the Jeep at the expiration of Plaintiffs' lease. The trial court found that Appellant wished to protect itself from liability in the event of injury to a subsequent owner or lessee of the Jeep. Opinion and Verdict, 6/23/14, at 9. The trial court also opined that Appellant feared that Plaintiffs could do further inspection of the Jeep if Plaintiffs purchased it at the end of the lease. *Id.* at 10.

These findings are devoid of record support. *See Brown*, 860 A.2d at 502. Trial Exhibit 50, a compilation of letters relevant to the termination of Plaintiffs' lease and Appellant's purchase of the Jeep, includes a letter of June 1, 1998, authored by Appellant's counsel and referencing a prior conversation with Plaintiffs' counsel in which Plaintiffs' counsel indicated Plaintiffs' intent to "dispose of or sell the vehicle which is at issue in this case[.]" Trial Exhibit 50, Letter of June 1, 1998. Appellant expressed its desire to "have an expert inspect the vehicle." *Id.* On July 6, 1998, Appellant's counsel authored a letter to Plaintiffs' counsel confirming a conversation wherein Plaintiffs'

---

evidence of bad faith in Appellant's initial decision to repair the Jeep rather than declare it a total loss.

counsel agreed to permit an "initial inspection" with a representative of Plaintiffs present. Trial Exhibit 50, Letter of July 6, 1998. Appellant also reserved its right to conduct a "second inspection." *Id.* Anderton's visual inspection of the Jeep (see the timeline above), apparently the "initial inspection" referenced in the July 6, 1998 letter, took place on August 21, 1998. *See* Trial Exhibit 50, Letters of August 20, 1998 and September 16, 1998. The September 16, 1998 letter from Appellant's counsel to Plaintiffs' counsel explained the need for further inspection, including disassembly of the Jeep and placing the frame on a "frame measuring instrument." Trial Exhibit 50, Letter of September 16, 1998.

On December 11, 1998, Plaintiffs' counsel wrote a letter to counsel for Appellant and Lindgren stating, "the Berg's [sic] lease will terminate next week **and they will need to turn in the vehicle**. Upon receipt of this letter kindly contact me immediately to advise of your position on the disposition of the vehicle." Trial Exhibit 50, Letter of December 11, 1998 (emphasis added).

Two weeks later, on December 24, 1998, Appellant's counsel wrote a letter to Plaintiffs' counsel indicating that Summit Bank accepted Appellant's offer to purchase the Jeep. Trial Exhibit 50, Letter of December 24, 1998. Plaintiffs' counsel authored a response on December 28, 1998 wherein he threatened to object to any evidence gleaned from the Jeep in the event Appellant failed to maintain its "authenticity and integrity." Trial Exhibit 50, Letter of December 28, 1998. Plaintiffs' counsel also offered to share storage

expenses. *Id.* Plaintiffs' counsel authored another letter, dated January 6, 1999, demanding immediate arrangements "to secure the vehicle to maintain the authenticity and integrity of this critical evidence." Trial Exhibit 50, Letter of Janaury 6, 1999.

Appellant's counsel responded on January 8, 1999, stating that Appellant mailed Summit Bank a check as of that date. Trial Exhibit 50, Letter of January 8, 1999. Appellant's counsel offered assurances that "the integrity of this evidence will be maintained at all times." *Id.* On January 12, 1999, **after Plaintiffs' lease expired, after Appellant and Summit Bank reached an agreement of sale, and after Appellant mailed its payment to Summit Bank**, Plaintiffs' counsel wrote:

> If you are unable to enter a written agreement whereby the vehicle will be stored in a facility that will ensure the integrity and authenticity of the evidence, we will need to purchase the evidence tomorrow, **in accordance with our clients' right of first option to purchase.** Thereafter, the evidence will be maintained for an additional 30 days for both Defendants to complete their inspection. After 30 days the evidence will be sold, with full disclosure, to the highest of three offers.

Trial Exhibit 50, Letter of January 12, 1999 (emphasis added). The following day, January 13, 1999, Appellant's counsel wrote a letter to Summit Bank threatening litigation if Summit Bank failed to complete the sale of the Jeep to Appellant. Trial Exhibit 27.

The trial court reached these findings:

> An additional fact to consider when logically answering why Defendant ultimately totaled the Jeep is that Plaintiff's attorney made clear his intent to purchase the Jeep himself. Defendant's

> letter of January 13, 1999 to Summit Bank […] threated legal action if Summit Bank did not transfer title to Defendant. It was written directly after [Plaintiffs' counsel] expressed interest in purchasing the Jeep. Did Defendant fear that by Plaintiffs' purchasing this Jeep, a full analysis could be done by Plaintiffs in furtherance of this litigation?

Opinion and Verdict, 6/23/14, at 9-10.[22]

To the contrary, Plaintiffs' counsel did not make clear the Plaintiffs' intent to purchase the Jeep. On December 11, 1998, Plaintiffs' counsel wrote that the lease was terminating the following week **and that Plaintiffs would turn the Jeep in**. Subsequently, Appellant reached an agreement to purchase the Jeep and tendered payment to Summit Bank. After Appellant tendered payment to Summit Bank Plaintiffs' counsel expressed intent to purchase the Jeep **if** the parties did not reach an agreement as to storing and preserving the Jeep. Given that the lease expired in mid-December of 1998, it is unclear whether Plaintiffs' purchase option remained enforceable in mid-January 1999. The record does not demonstrate that Plaintiffs expressed any intent, prior to expiration of the lease, to exercise their purchase option. The record also does not demonstrate how Appellant prevented—or had the power to prevent—Plaintiffs from exercising their purchase option prior to termination of their lease. Plaintiffs' counsel's letter of January 12, 1999 clearly precipitated Appellant's January 13, 1999 letter to Summit Bank

_____

[22] The trial court consistently refers to Appellant's purchase of the Jeep as "totaling" the Jeep.

threatening to enforce the agreement of sale for the Jeep. The trial court's erroneous characterization of record evidence, including correspondence, is a basis for overturning a bad faith verdict. *Condio*, 899 A.2d at 1150.

We likewise find no support in the record for the trial court's finding that Appellant prevented Plaintiffs from conducting a "full analysis [of the Jeep] in furtherance of this lawsuit." Opinion and Verdict, 6/23/14, at 10. Plaintiffs were in possession of the Jeep from December 31, 1996, the date Lindgren returned it, until mid-December, 1998, when the lease expired. Phillips inspected the Jeep for Plaintiffs in November of 1997. Plaintiffs made no further inspections of the Jeep prior to the expiration of the lease or during its storage after Appellant purchased it. Pursuant to a February 11, 1999 order from Judge Stallone, the parties were to share storage expenses and each party had full access to the Jeep.

The trial court also found:

> Defendant then chose, for whatever reason, to spend an additional $18,000 [the price Appellant paid to Summit Bank] for what it claimed was to preserve the evidence; **yet no action whatsoever was subsequently taken to inspect or further examine or analyze this preserved evidence, at least not that which resulted in further discoverable reports or testimony from January 1999 forward.**

Opinion and Verdict, 6/23/14, at 10 (emphasis added). The bolded portion is entirely without record support. Anderton conducted a full inspection of the Jeep on April 20, 1999, produced a report, and testified at trial. As per the timeline above, Plaintiffs permitted Anderton **only** a visual inspection until

after Appellant purchased and took possession of the Jeep. To the extent Appellant's purchase of the Jeep prevented an unsuspecting third party from purchasing and driving the Jeep, it seems to us an act of prudence rather than of bad faith.

The trial court also faulted Appellant for its eventual disposal of the Jeep. As noted above, Judge Stallone entered an order mandating shared storage expenses and shared access to the Jeep. Plaintiffs conducted no further inspections, nor did they ever pay their share of the storage fees. Judge Stallone entered an order dated October 29, 2007, **permitting Appellant to dispose of the Jeep**. By that time, Plaintiffs' expert inspected the Jeep and Potosnak and Anderton inspected it for Appellant. It is not clear that the Jeep was of further evidentiary value to either party or, more importantly, that Plaintiffs were prejudiced by its disposal. Despite the foregoing, the trial court wrote:

> Defendant is correct that Judge Stallone's order did, in fact, permit Defendant to dispose of Plaintiff's Jeep. Defendant argues that, in and of itself, excuses it from any accusation of bad faith. However, Defendant's argument is shallow because [D]efendant still could have avoided the spoliation of the most important piece of evidence in the case even if disposing of the Jeep was permitted by Judge Stallone's order, and even if it was not opposed by [P]laintiffs, and even if [D]efendant was accumulating monthly service fees by not disposing of the vehicle. Defendant spent millions of dollars on attorney fees alone, so it is unclear why it did not want to maintain the non-spoliation of the evidence and to pay for the continued storage of the Jeep. Defendant easily could have maintained this vital evidence in a case that was in ongoing litigation. What was the hurry to destroy the Jeep?

> Furthermore, if [D]efendant had allowed [P]laintiff to purchase (and thereby preserve the evidence), [D]efendant would not have paid a penny more for storage.

Trial Court Opinion, 7/23/15, at 10-11. The trial court's analysis—that Appellant prevented Plaintiffs from purchasing the Jeep and then destroyed it to prevent further inspection—has no support in the record. In fact, Plaintiffs raised no claim of prejudice due to spoliation, as there is no dispute that the repairs were very poorly done. Nor do Plaintiffs claim they were deprived of a reasonable opportunity to inspect the Jeep.

The trial court also found that Appellant engaged in bad faith during the conduct of this litigation.[23] The trial court found that Appellant hid and refused to give discoverable material to Plaintiffs, never produced photographs of the Jeep taken during the appraisal process, and refused to produce Potosnak's report[24] until ordered to do so during discovery. To the extent the trial court based its finding of bad faith upon discovery violations, it committed clear error. While it is true that a finding of bad faith under section 8371 may be premised upon an insurer's conduct occurring before, during or after litigation, *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901 (Pa. Super. 2002), we have

---

[23] To the extent the trial court's finding that Appellant violated the Unfair Insurance Practices Act in its conduct of this litigation—again, the trial court found a violation without addressing that Act in any detail—we address that matter in this section.

[24] Appellant originally produced a claims log with Potosnak's report redacted.

refused to recognize that an insurer's discovery practices constitute grounds for a bad faith claim under section 8371, absent the use of discovery to conduct an improper investigation. *Id.*; *Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. 2004).[25]  As we explained in *O'Donnell* and *Hollock*, section 8371 is designed to provide a remedy for bad faith conduct by an insurer in its capacity as an insurer for breach of its fiduciary duty to an insured by virtue of the parties' insurance policy and not as a legal adversary in a lawsuit filed against it by an insured.  Discovery violations are governed under the exclusive provisions of the Pennsylvania Rules of Civil Procedure. Nonetheless, even when considering these issues, we still find no merit to them supporting a bad faith claim under section 8371 by clear and convincing evidence.

Appellant repeatedly refused to produce an unredacted claims log (Trial Exhibit 8) with no apparent valid grounds for doing so.  We do not condone Appellant's apparently baseless refusal to comply with discovery requests. Nonetheless, the record does not support a finding that Appellant was hiding "smoking gun" evidence that proved its bad faith.  The claims log, in our view, contradicts the trial court's finding that Appellant "vetoed" Joffred's total loss appraisal.  The log confirms that a "12k" repair estimate existed as of September 11, 1997, and that a teardown was necessary to determine the

---

[25] The Dissent fails to acknowledge this settled point of law.  *See* Dissenting Opinion at 7.

extent of the structural damage. Concerning the redaction of Potosnak's notes of his April 28, 1998 inspection, we already have explained that Plaintiffs were aware of the Jeep's problems well in advance of Potosnak's inspection. As for the missing photographs from the initial appraisal, we believe these are of limited evidentiary value. There is no dispute that the Jeep was badly damaged in the accident. In any event, a teardown was necessary to assess the extent of damage to the Jeep.

We also reject the trial court's finding of bad faith on the basis Appellant hoped to overwhelm Plaintiffs with superior resources and adopted a scorched earth policy towards this litigation. Trial Court Opinion, 7/23/15, at 14-15. The trial court's conclusion is an apparent reference to and reliance upon this Court's opinion in **Bonenberger**, in which we concluded that Nationwide in that case engaged in bad faith in its handling of a claim and the subsequent litigation. In **Bonenberger**, the plaintiff proved that Nationwide undercompensated its insured's soft tissue injury[26] by tens of thousands of dollars. **Bonenberger**, 791 A.2d at 380-81. Nationwide made a settlement offer of $14,700 and an arbitration panel found the claim worth nearly $80,000. **Id.** at 379. This Court held that the trial court properly admitted evidence of Nationwide's Pennsylvania Best Claims Practice Manual, which set

---

[26] Several witnesses testified that the claims manual at issue in **Bonenberger** applied to bodily injury and not property damage. N.T. Trial, 6/5/07, at 114-15; N.T. Trial, 6/7/07, at 502-03.

forth Nationwide's philosophy "to reduce the average claim payment to a level first consistent with then lower than major competitors, and to be a 'defense-minded' carrier in the minds of the legal community." *Id.* at 381. Since Nationwide's published philosophy did not encourage case-by-case evaluation of the merits of a claim, we concluded the manual supported a finding of bad faith.

Instantly, the trial court acknowledged that there is **no** evidence Appellant relied upon the "Pennsylvania Best Claims Practice Manual" in adjusting the property damage claim at issue in this case. Trial Court Opinion, 7/23/15, at 38. Nevertheless, the trial court cited the ***Bonenberger*** opinion as "independent, substantiated evidence" that the manual exited as early as 1993 and that Appellant's personnel used it "as their primary guide to evaluating, valuing, and negotiating claims." *Id.* Instantly, absent clear and convincing evidence of bad faith in Appellant's handling of Plaintiffs' claim and absent any evidence that Appellant relied on the manual at issue in ***Bonenberger***, that case is simply inapposite and cannot form the basis for a finding of bad faith in this action.

In addition, the trial court found that Appellant engaged in bad faith as evidenced by the length of this litigation. In support of this conclusion, the trial court focused upon discovery issues, the disclosure and production of the Potosnak report, the purchase of the Jeep by Appellants, and the amount of fees and expenses incurred by Appellant in defense of this claim. Trial Court

Opinion, 7/23/15, at 18-22. We already have addressed and dismissed many of these contentions. We decline further to conduct a detailed analysis of nearly two decades of highly contentious litigation and we note that the trial court did not do so in its findings. Plaintiffs had the right to prosecute their case zealously within the bounds of the law, just as Appellant had the right to defend itself if it believed its personnel did not act in bad faith. We cannot arbitrarily impose a limit on the time and resources an insurer spends in defending a bad faith action.

Finally, the trial court found that Appellant engaged in bad faith by not promptly processing, adjusting, and settling this claim. Trial Court Opinion, 7/23/15, at 35, 37. In support of this finding, the trial court once again points to the length of time litigating this claim, the cost to defend this action, Appellant overruling Lindgren's initial appraisal declaring the Jeep a total loss, Appellant's purchase of the Jeep only after Plaintiffs made all their lease payments, and the scorched earth message Appellant desired to send to claimants. We adequately have addressed and dismissed these claims as not having record support, and in particular, as not establishing bad faith by clear and convincing evidence. As we noted previously, the record does not support a finding that Appellant failed to attempt to resolve this dispute in its early stages. In particular, Appellant asked for permission to have an independent expert inspect the Jeep two weeks after Plaintiffs filed suit against Appellant,

after which Appellant informed Plaintiffs it would pay to have the Jeep repaired at a shop of Plaintiff's choice or purchase the Jeep if it could not be repaired.

### 5. The trial court's opinions.

Judge Sprecher's June 23, 2014 opinion and verdict and its July 23, 2015 Pa.R.A.P. 1925(a) opinion span more than one hundred pages combined. Judge Sprecher devoted substantial portions of his opinions to matters not of record. We are troubled by Judge Sprecher's failure to limit his analysis to the facts of this case and applicable law. The following illustrates our concern regarding Judge Sprecher's consideration of matters outside this case record.

In his opinion and verdict, Judge Sprecher wrote:

> [W]hat [p]laintiff, and more importantly, what lawyer in his right mind will compete with a conglomerate insurance company if the insurance company can drag the case out 18 years and is willing to spend $3 million in defense expenses to keep the policyholder from getting just compensation under the contract. Its message is 1) that it is a defense minded carrier, 2) do not mess with us if you know what is good for you, 3) you cannot run with the big dogs, 4) there *is* no level playing field to be had in your case, 5) you cannot afford it and what client will pay thousands of dollars to fight the battle, 6) so we can get away with anything we want to, and 7) you cannot stop us.

Opinion and Verdict, 6/23/14, at 41.[27]

Judge Sprecher's Pa.R.A.P. 1925(a) opinion also contains a section titled "Business Formula for Profitability." Trial Court Opinion, 7/23/15, at 20. That section reads in part as follows:

---

[27] "Defense minded carrier" is an apparent reference to this Court's opinion in **Bonenberger**.

How does defendant reduce the cost of doing business to increase its profits? First, it will only pay the cost for repair or replacement of the clients' automobiles if damage occurs, if the insureds have current coverage, and only if the claim is timely filed.

Beyond the basics, what can Nationwide do to control its bottom line? Its employees and agents might be directed to constantly explore and implement cost cutting measures to reduce the amount of claims that it is required to pay. For instance, to reduce its expenses, it can eliminate clients who are projected to be high risks due to age, gender, residence, and other factors, including excessive use of the car and the accident and motor vehicle violation history of the client. Or it can label these people as high risk and greatly increase their premiums accordingly.

Every insurance company is operating on risk projections to measure and control its cost. The more control the insurance company has over its profits and, more importantly, its risk of loss, the more control it has over a huge unknown, its cost of doing business.

*Id.* at 20-21. The question before Judge Sprecher was whether Plaintiffs proved, by clear and convincing evidence, that Appellant acted in bad faith **in this case**. Cost containment measures employed by the insurance industry in general have no bearing on whether Appellant committed bad faith in this case. Moreover, these matters are outside the record.

The trial court also offered its thoughts on civil personal injury claims in general and bad faith claims in particular. *Id.* at 21-24.

The greatest problem for the plaintiff in a bad faith claim against an insurance company is, once again, the risk. In this case, it is astronomical. The insured takes a huge risk that the case could go on without compensation for years. The insured's attorney is not likely to pursue litigation either due to a risk of no compensation, or at least the long delay in receiving any compensation is compounded by the greater risk that he could be devoting thousands of dollars of in-kind legal fees and expenses

> to pursue this case. And for what? This is the best example of David taking on Goliath. Who is willing to risk all that?

*Id.* at 24. We note that some plaintiffs are successful in their bad faith causes of action, as were the plaintiffs in, for example **Bonenberger** and **Hollock**. Furthermore, the prospect of years of litigation cuts both ways. Certainly, the insurance company likely will have vastly more resources than a plaintiff, and it can employ those resources in defending itself. On the other hand, a persistent plaintiff can impose significant defense costs on an insurer, even if the plaintiff's claim is ultimately unsuccessful. A court must base its decisions on the facts and merits of the case before it rather than its general perception of a party or an industry.

Judge Sprecher goes on to analyze the psychology of choosing an insurance company and policy:

> Unlike almost all other products that a customer may purchase, with insurance he may never use or spend that which he bought. All insurance, to varying degrees, exemplifies this apparent paradox. With life insurance, a customer may own coverage for forty years and never use it, paying all those premiums for an event that, fortunately, did not occur in those years. The customer may purchase one million dollars of coverage, pay forty years of premiums, and neither he nor his family ever receives a penny in return. After forty years, he may drop it because he no longer needs life coverage and the premiums are at the highest level. But for forty years his family received peace of mind, knowing that if the breadwinner dies, there will be $1,000,000 delivered to help his family make up for some of his loss.

> The customers purchase insurance almost exclusively on good faith and trust. The whole concept of insurance is to provide complete coverage to the customer to assure that whatever a terrible expense or great loss is suffered there is coverage against

a debt that cannot possibly be borne by the customer alone. The customer trusts that a very reliable company will drop everything to come to his aid at a time of disaster. The customers may not begin to comprehend the workings of the insurance industry or know that there is an insurance commissioner provided by their government to check and balance the industry and to come to the aid of the customers. The customer does not know one insurance company from another. All he generally does know is that this company is one he trusts, with an agent who is a member of the community, possessing a solid reputation, who sells the product and stands behind it. The agent for the insurance company might be the only person the customer knows in the entire massive insurance industry.

The insurance contract is an example of two parties that are nowhere near on the same level of sophistication, knowledge, resources, and power to negotiate an arms-length deal entering into a binding agreement. The customer pays first for the company to provide full coverage for the length of the contract. The insurance company determines who, what, when and why it will pay. It may not ever process a complaint and it may never pay anything back to the customer. So what does the customer purchase? Pease of mind coverage. The customer fully relies on the insurance company, Goliath, acting in good faith. He trusts that the company will provide a prompt, good faith representation during his time of greatest need.

What does good faith representation mean to the customer? The assurance that the customer is in good hands, totally covered and protected by the comforting embrace of his insurance company, the enormous, powerful entity that holds him close to the heart while providing deep pockets, if needed, to cover any award against the customer. The company provides full and qualified legal representation to the customer. All of this is promised by the insurance company.

*Id.* at 24-26.

This passage has no relationship to the facts and issues present in this case. This is an automobile insurance case, not a life insurance case, and it involves damage to the automobile only. Fortunately, nobody was injured in

the accident that damaged the Jeep and nobody was injured in the Jeep at any time thereafter. Plaintiffs were not facing any prospect of a judgment against them, nor were they in need of legal defense in connection with the underlying accident.

Judge Sprecher continued with a similarly irrelevant analysis of insurance industry advertising:

> Unlike most products that the consumer buys, there is very little substance to that which gets advertised in the insurance world. The insurance companies advertise intangibles such as being a good neighbor, providing friendly service, and immediately responding. Some companies stress only a possible savings to the customer, using vacationing pigs singing 'boots and pants,' cavemen playing golf, and other nonsense props and storylines to entertain, to catch the attention of the customer. The ads, if they do say anything of value, might boast that the company is providing better and friendlier service or that '15 minutes *could* save you 15%,' or that they have been perhaps 'saving the public money for 75 years.' Again, the consumer is in the dark, which stresses an even greater need for trustworthiness and good faith representation.

*Id.* at 27 (italics in original).

The parties did not create a record on the advertising practices of the insurance industry, and we discern no valid basis for Judge Sprecher's decision to offer these observations in support of his opinion in this case. The opinion continues in similar fashion until page 31, which begins a section titled "Justice Provided for Bad Faith." *Id.* at 31. That section concludes:

> Insurance companies are well compensated in a way that allows them to operate a successful business and accumulate wealth. They must perform their fundamentally required services to their insured. The company owes this duty to the insured, to the public, and to the industry. It cannot use its massive assets

and prominent position to take advantage of the very small client. It must not threaten or attempt to initiate a David and Goliath relationship with its insured.

*Id.* at 33.

Judge Sprecher also wrote at length on the relative wealth and power of an insurance company compared to a single insured. Our law imposes a duty of good faith and fair dealing on insurance companies, and § 8371 provides for punitive damages in the event of insurer bad faith. Thus, the law provides insureds with a means of addressing any misconduct by their insurers. The relative power and wealth of the insurer as compared to the insured is not relevant to whether bad faith occurred in a particular case, unless some factual basis can be shown that the insurer used its wealth to engage in bad faith. The insured bears the burden of proving, by clear and convincing evidence, that the insurer acted in bad faith in the insured's case. Indeed, we have written that, to succeed, a bad faith plaintiff must meet a "high burden." ***Berg II***, 44 A.3d at 1176. A judge sitting as fact finder in a bad faith case should confine his or her analysis to the facts of the case at bar without any consideration of the perceived ills of the insurance industry in general.

Appellant asserts that the trial court seized this case as an opportunity to level the playing field between insurers and insureds, so much so that its finding of bad faith was a foregone conclusion. Appellant's Brief at 51. Appellant also argues that the trial court's disposition of this case was motivated by partiality, prejudice, bias, or ill will. *Id.* Given our conclusion

that the record does not support the trial court's necessary findings of fact to establish bad faith, we need not further address this issue.

### Conclusion

We vacate the judgment because the record does not support many of the trial court's critical findings of fact. We are cognizant of the standard governing our review, and we have not reached our decision lightly. We understand that the trial court, as fact finder, was free to choose which evidence to believe and disbelieve. Likewise, we understand that our standard of review requires us to defer to findings supported in the record and draw reasonable inferences in favor of Plaintiffs. Nonetheless, our case law provides that bad faith claims are fact specific (*Condio*, 899 A.2d at 1143), must be proven by clear and convincing evidence, and that the fact finder must consider "all of the evidence available" (*Berg II*, 44 A.3d at 1179). After an exhaustive review of the very large record in this case, we believe we have no choice but to vacate the judgment. We have quoted extensively from the record in an effort to provide full context for our decision. We observe that the trial court's opinions, while very lengthy, cite infrequently to the record.

We disagree with the Dissent's assertion that we are substituting our own findings for those of the trial court. Rather, our review of the extensive record in this matter convinces us that the trial court's findings are not supported by the facts of record and our citations to the certified record belie any assertion that we have improperly substituted our findings for the trial

court's.  The law permits a finding of bad faith only on clear and convincing evidence.  Clear and convincing evidence is evidence that is "so clear, direct, weighty, and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."  ***Grossi***, 79 A.3d at 1165.  The trial court's highly selective citation to a voluminous record plainly failed to meet that standard.  Respectfully, we believe the Dissent, under the guise of strict adherence to the standard of review, makes the same error.

In summary, we have concluded:  (1) the record does not support the trial court's finding that Joffred issued a repair estimate on September 20, 1997 only after Witmer vetoed Joffred's total loss appraisal; (2) the record contains no evidence that the Jeep was damaged beyond repair; (3) the record contains no evidence that Appellant had actual knowledge of the Jeep's condition upon its return to Plaintiffs; and (4) Appellant's conduct subsequent to its knowledge of the Jeep's condition—including its conduct of this litigation—was not a bad faith effort to cover up prior misdeeds.

The trial court engaged in a limited and highly selective analysis of the facts and drew the most malignant possible inferences from the facts it chose to consider.  We do not believe our appellate standard of review, circumscribed as it is, requires or even permits us to affirm the trial court's decision in this case.  This is especially so given Plaintiffs' burden of proving their case by

clear and convincing evidence.  We have no occasion to address Appellant's remaining assertions of error.

Judgment vacated.  Case remanded for entry of judgment in favor of Appellant.  Jurisdiction relinquished.

Judge Ott joins the opinion.

President Judge Emeritus Stevens files a dissenting opinion.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/9/18